UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN WHITNEY,                    )
    Petitioner,              )
                               )
        v.                  )   C.A. No. 07-10820-MLW
                               )
LUIS SPENCER,                    )
    Respondent.              )

MEMORANDUM AND ORDER

WOLF, D.J.                                    September 29, 2011

I.   INTRODUCTION

Petitioner John Whitney seeks habeas relief pursuant to 28 U.S.C. §2254.  The court has thoroughly reviewed the record and memoranda submitted by the parties.  For the reasons stated in this Memorandum and Order, the petition is being denied.

II.  PROCEDURAL HISTORY

The following procedural history is not disputed.

In March, 1999, a Norfolk County grand jury returned an indictment charging petitioner with murder pursuant to Mass. Gen. Laws c. 265, §1.  The charges arose out of the death of Alberto Portal.  On June 9, 2000, following a jury trial, petitioner was convicted of murder in the second degree and sentenced to life in prison.  Petitioner appealed his conviction.

While the direct appeal was pending, petitioner filed a motion for a new trial.[1]  On January 15, 2003, the trial court denied the

---

[1]This was petitioner's second motion for a new trial, the first having been denied and not appealed.

1

motion after a three-day evidentiary hearing.  See Commonwealth v. Whitney, No. 107023, at 6 (Jan. 15, 2003)("Whitney I")(Connolly, J.).  Petitioner appealed the denial of a new trial.

Petitioner's direct appeal and appeal from the denial of a new trial were consolidated by the Massachusetts Appeals Court (the "Appeals Court").  See Commonwealth v. Whitney, 826 N.E.2d 219, 222 (Mass. App. Ct. 2005)(Cowin, J.)("Whitney II")(Cowin, J.).  The Appeals Court affirmed the conviction and the denial of a new trial.  See id. at 228.  Petitioner moved for rehearing, and, on February 2, 2006, the Appeals Court denied the motion.  See Commonwealth v. Whitney, No. 01-P-229, at 2 ("Whitney III").  The Supreme Judicial Court summarily denied petitioner's application for further appellate review.  See Commonwealth v. Whitney, 843 N.E.2d 639 (Mass. 2006)(table).  This petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254 followed.

III. ANALYSIS

A.  Habeas Corpus Under 28 U.S.C. §2254

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the court must determine whether the decision below (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. §2254(d); DeBurgo v. St.

Amand, 587 F.3d 61, 67 (1st Cir. 2009); see also Foxworth v. St. Amand, 570 F.3d 414, 425 (1st Cir. 2009)(defining unreasonable application of clearly established federal law). In doing so, the court relies on the facts found by the state courts, supplemented with other facts from the record that are consistent with the state courts' findings. See Lynch v. Ficco, 438 F.3d 35, 39 (1st Cir. 2006). The court must presume that the state court's factual determinations are correct unless the petitioner rebuts this "presumption of correctness" by coming forward with "clear and convincing evidence" to the contrary. See 28 U.S.C. §2254(e)(1); Coombs v. Maine, 202 F.3d 14, 18 (1st Cir. 2000); see also DeBurgo, 587 F.3d at 62 (stating that federal court is "bound to 'accept the state court findings of fact unless [defendant] convinces [the court], by clear and convincing evidence, that they are in error"); Lynch, 438 F.3d at 39 (same). This presumption of correctness applies whether the factual finding is made by a state trial court or a state appellate court. See Teti v. Bender, 507 F.3d 50, 58 (1st Cir. 2007).

   B. <u>Ground One: Unreasonable Determination of the Facts</u>

   In Ground One, petitioner asserts that he is entitled to relief under 28 U.S.C. §2254(d)(2) because the Appeals Court's adjudication was based on an unreasonable determination of the facts in light of the evidence presented in petitioner's trial and post-conviction evidentiary hearing. In support of this

contention, petitioner challenges several specific factual determinations. Although the interplay between §2254(d)(2) and §2254(e)(1) has not been precisely established in this circuit, the First Circuit has applied the standard of §2254(e)(1) when deciding challenges to specific factual determinations, such as those challenged here. See Teti, 507 F.3d at 58 (citing Miller-El v. Cockrell, 537 U.S. 322, 341-42 (2003); see also Robidoux v. O'Brien, 643 F.3d 334, 338 n.3 (1st Cir. 2011)("We have previously declined to delve into the relationship between subsections (d)(2) and (e)(1), as has the Supreme Court, and again have no need to do so." (internal citations omitted)). In DeBurgo, for example, where petitioner claimed relief under §2254(d)(2) based on an unreasonable determination of facts by the state court, the First Circuit explicitly applied §2254(e)(1)'s presumption of correctness and required any allegedly erroneous factual determinations to be rebutted by clear and convincing evidence. See 587 F.3d at 70-71.

Consequently, the court presumes the state courts' factual determinations to be correct unless petitioner overcomes that presumption by presenting clear and convincing evidence to the contrary. See Teti, 507 F.3d at 58.[2] Thus, a petitioner "'must clear a high hurdle before [the court] will set aside any of the state court's factual findings.'" Allison v. Ficco, 388 F.3d 367,

_____

[2]Petitioner acknowledges this standard to be applicable. See Mem. in Support of Petition at 11.

370 (1st Cir. 2004)(quoting <u>Mastracchio v. Vose</u>, 274 F.3d 590, 598 (1st Cir. 2001)).  "Under this regime, a federal habeas court ordinarily refrains from revisiting credibility determinations as 'it would be wholly inappropriate for a federal court to repastinate soil already thoroughly plowed and delve into the veracity of the witnesses on habeas review.'"  <u>Mastracchio</u>, 274 F.3d at 598 (quoting <u>Sanna v. Dipaolo</u>, 265 F.3d 1, 10 (1st Cir. 2001)).

    1.  <u>Factual Determinations Based on Trial Testimony</u>

    Petitioner first challenges various factual determinations arising out of the testimony at trial.  As explained below, the specific determinations challenged by petitioner are supported by trial testimony and are not rebutted by clear and convincing evidence.  See <u>Teti</u>, 507 F.3d at 58.

    In summary, based on the evidence presented at trial, the Appeals Court found that Alberto Portal, the victim, was married to Laura Portal.  See <u>Whitney II</u>, 826 N.E.2d at 223.  Laura Portal had a previous relationship with petitioner, which had resulted in the birth of a son, who lived with Laura and Alberto.  See <u>id.</u> Petitioner told a friend, Tammy Buffum, that he was seeing Laura more frequently and that Alberto Portal did not treat petitioner's son well.  See <u>id.</u>

    On a night in early December, 1997, at approximately the time of night when Alberto Portal typically left his home to work a

night-shift, petitioner arranged for a friend, Thomas Pratt, to drive him to a location approximately 200 to 300 feet from the home of Alberto Portal. See id. at 222-23. Petitioner got out of the car and directed Pratt to meet him later that evening at the Sportsman's Lounge. See id. at 222. Approximately one hour later, petitioner arrived the Sportsman's Lounge, stated that he had to drop a car off, and asked Pratt to follow in Pratt's car. See id. The car driven by petitioner matched the description of the victim's car. See id. at 224. Petitioner drove the car to an Enterprise Rent-a-Car parking area, parked it, and then departed with Pratt in Pratt's car. See id. at 223. Before parting company with Pratt, petitioner told Pratt that if anyone asked, especially the police, Pratt should say that he and petitioner had spent the night drinking at an American Legion Hall. See id.

Alberto Portal and his car were reported missing as of December 4, 1997, when he failed to report to work. See id. Approximately three months later, Alberto Portal's car was found in the same Enterprise Rent-a-Car parking area and in the same spot where petitioner had parked the car the previous December. See id. at 223-24. Alberto Portal's partially decomposed body was found in the trunk of the car, and the cause of death was later determined to be blunt trauma to the head. See id. at 223. At the time of his arrest on March 13, 1998, petitioner told police, "I'm not a murderer. I didn't dump no body. I just dropped a car off." See

6

id.

The court addresses each challenge to a factual determination in turn. First, petitioner challenges the finding that Pratt "met the [petitioner] in Natick at approximately 6:30 p.m., and they drove in Pratt's automobile for about forty minutes to the Hopedale-Mendon area." Id. at 222. Pratt testified that he did not remember where he picked up petitioner in early December. See Supp. Ans. ("SA") Ex. 13 at 96, 98. However, he also testified that he picked up Whitney in Natick on December 4, 1997, at approximately 6:00 or 6:30 p.m., and that they then proceeded to a location on the border of Hopedale and Mendon. See id. at 52-57, 99. Although this discrepancy created an issue of credibility for a factfinder, information raising questions of credibility is not, under ordinary circumstances, clear and convincing evidence rebutting presumptively correct factual determinations. See Sanna, 265 F.3d at 10.

Second, petitioner challenges the finding that, at Whitney's direction, Pratt drove Whitney to "a location approximately 200 to 300 feet away from the home of the victim." See Whitney II, 826 N.E.2d at 222. In a related argument, he challenges the finding that "Pratt took the police to the area near the Portal home at which he had dropped off the defendant." See id. at 223. It is true that Pratt testified that he did not remember where he dropped off petitioner. See SA Ex. 13 at 108; see also id. at 150.

However, he also testified that, after the investigation into the murder began, he and the police "went onto the road where [Pratt] dropped [petitioner] off," and that, when they were "pretty much near where [Pratt] dropped [petitioner] off," Pratt told police "'I think it's somewhere in this area.'"   See id. at 82.   Detective John Ryan, who was present when Pratt showed the police the location at which he dropped off petitioner, testified that the location identified by Pratt was in the area of a particular garage, and that the garage was approximately 200 to 300 feet from Alberto Portal's home.   See id. at 147.   Consequently, there was adequate support for the finding that Pratt took the police to the area where he dropped off petitioner and adequate support for the finding that the location was 200 to 300 feet from the victim's home.   Although Pratt's testimony that he did not, at trial, remember the location raised an issue of credibility regarding his identification of the area to police, it is not clear and convincing evidence sufficient to rebut the correctness of the relevant factual determinations.   See Sanna, 265 F.3d at 10.

Third, petitioner challenges the finding that, while Pratt drove petitioner to petitioner's ex-wife's home at the end of the evening, petitioner "seemed neither nervous nor upset" and "spoke little during the ride."   See Whitney II, 826 N.E.2d at 223.   This finding is supported by Pratt's testimony that any conversation he had with petitioner during that period of time was "very light" and

that petitioner did not seem nervous or upset that evening.  <u>See</u> SA Ex. 13 at 69-70, 122.  No evidence rebuts this finding.

Fourth, petitioner challenges the finding that petitioner had the "opportunity to dispose of blood or a weapon." <u>See</u> <u>Whitney II</u>, 826 N.E.2d at 224.  However, this finding can reasonably be inferred by Pratt's testimony that, after Pratt arrived at the Sportsman's Lounge, petitioner did not join him for approximately an hour to an hour and a half.  <u>See</u> SA Ex. 13 at 64.  There was no evidence that this time period was substantially shorter.

Fifth, petitioner challenges the finding that "Buffum in fact accompanied the [petitioner] to the victim's house in early December 1997, so that [petitioner] could visit his son and bring him a present."  <u>See</u> <u>Whitney II</u>, 826 N.E.2d at 223.  This finding is supported by Buffum's testimony that she and petitioner visited that home at the end of November, 1997, or the beginning of December, 1997.  <u>See</u> SA Ex. 12 at 148, 179, 187.  Indeed, during cross-examination by trial counsel, Buffum testified at some length about the possibility that she made this visit in early December, 1997.  <u>See</u> <u>id.</u> at 187.

Sixth, petitioner challenges the implicit finding that petitioner had sufficient knowledge about the location of the victim's home to direct Pratt there.  <u>See</u> <u>Whitney II</u>, 826 N.E.2d at 224. Buffum did testify that petitioner initially did not know how to get to the victim's home when she accompanied him there in late

9

November, 1997, or early December, 1997.  See SA Ex. 12 at 186. However, Buffum later testified that petitioner then received directions by phone and stated "he knew how to get there."  Id. at 187-88.  In any event, the testimony of Pratt and Detective Ryan supported a finding that petitioner did, in fact, direct Pratt to a location near the victim's home and, therefore, must have had sufficient knowledge of the route to that location.  See SA Ex. 13 at 60, 82, 147.

Seventh, petitioner challenges the finding that petitioner may have been motivated by anger over the victim's treatment of petitioner's son.  See Whitney II, 826 N.E.2d at 223.  Buffum did testify that petitioner had a very limited relationship with his son.  See SA Ex. 12 at 176-77.  However, Buffum also testified that, in late November, 1997, or early December, 1997, petitioner brought his son a gift, stated that the victim may have injured his son, and stated that the victim was not treating his son well.  See id. at 148, 155-56, 160.  This testimony supports the finding that petitioner cared for his son and was bothered by perceived mistreatment by Alberto Portal.

Eighth, petitioner challenges the finding that "[a]bout two months before Alberto's disappearance, [petitioner] told a friend, Tammy Buffum, that he was seeing Laura more frequently."  See Whitney II, 826 N.E.2d at 223.  This finding is supported by Buffum's testimony that, in October, 1997, petitioner told her that

10

he was having more contact with Laura.  <u>See</u> SA Ex. 12 at 167-68.

Ninth, petitioner challenges the finding that the jury could permissibly conclude that he timed his arrival at the Portal's home to coincide with Alberto's departure for work.  <u>See</u> <u>Whitney II</u>, 826 N.E.2d at 224.  Michael Gervais, the victim's coworker, testified that the victim regularly began work at 10:00 p.m., was "very, very prompt," and was never late for work.  <u>See</u> SA Ex. 12 at 53-58. Pratt testified that, when he and petitioner stopped for dinner on that evening in December, 1997, petitioner intentionally delayed departing the restaurant.  <u>See</u> SA Ex. 13 at 59.  In light of Buffum's testimony that petitioner was in contact with Laura Portal, the victim's wife, it is reasonable to infer that he could have learned the victim's schedule for regularly arriving at work at a particular time.  <u>See</u> SA Ex. 12 at 168.  Thus, there is not clear and convincing evidence rebutting the finding that the jury could have concluded that the victim had a regular schedule, that petitioner had access to information about that schedule, and that petitioner planned his travel to correspond with the victim's departure for work.

> 2.  <u>Factual Determinations Based on Post-Conviction Testimony</u>

Petitioner next challenges various factual determinations arising out of the testimony at petitioner's three-day post-conviction evidentiary hearing.  As explained below, the specific

determinations challenged by petitioner rest fundamentally on the state courts' resolution of questions of credibility and are not, therefore, rebutted by clear and convincing evidence.

Certain background information is helpful in understanding this portion of Ground One. The record indicates that Laura Portal, the victim's wife, asserted her Fifth Amendment privilege when called before the Grand Jury and, subsequently, did not testify at trial for the same reason. See SA Ex. 10 at 23. She also did not testify at the post-conviction evidentiary hearing.

Sergeant Joseph Palladini of the Franklin Police Department testified at trial that he received a report that the victim was missing on December 5, 1997, that he entered information about the victim and the victim's vehicle into a computer database, and that subsequent entries in the database indicated that police cruisers of the Foxboro and Norwood police sought information about the license plate on the victim's vehicle in January, 1998.[3] See SA Ex. 16 at 62-77. Trial counsel used this evidence to argue that the victim was alive and driving his car elsewhere in Massachusetts a month after petitioner supposedly killed him. See id. at 94.

Later, in his motion for a new trial, petitioner argued that his trial counsel was ineffective for failing to examine Palladini regarding an alleged inappropriate relationship between Palladini

---

[3]During trial, Palladini was evidently a somewhat reluctant witness, in that the court repeatedly had difficulty locating him when it was time for his testimony. See SA Ex. 16 at 59.

and Laura Portal during the course of the criminal investigation into Alberto Portal's disappearance and murder.  See SA Ex. 2 at 23.   Petitioner argued that information about Palladini's relationship with Laura Portal, if considered with evidence that Laura Portal knew the location of the victim's body before that information was publicly released, should have been used to suggest that Laura Portal was responsible for the murder and that Palladini compromised the investigation to protect her from prosecution.[4]  See id. at 28.   Following a three-day evidentiary hearing, the Superior Court issued findings of fact and implicitly credited Palladini's testimony that he did not have a relationship with Laura Portal.  See Whitney I at 4.  The Appeals Court adopted that finding.   See Whitney II, 826 N.E.2d at 225.   Additionally,

---

[4]Substantial evidence linked Laura Portal, the victim's wife, to the killing.  There was evidence that, when police told her that the victim was found at a car rental location, she correctly identified the company as Enterprise Car Rental without being told by the police.  See SA Ex. 21 at 171.  There was medical evidence that the victim could have been killed by a blow to the head while lying down, perhaps while he was sleeping, and that Laura Portal reported that she last saw the victim taking a nap.  See id. at 175, 189; SA Ex. 22 at 50.  There was evidence of her possible motive, including that the victim had mistreated her and had threatened to take her children to Portugal.  See SA Ex. 22 at 47.  Post-conviction counsel also proffered that evidence would show that, after the victim's disappearance but before the discovery of the body, Laura Portal had the interior of her house painted by petitioner.  See SA Ex. 23 at 88-89. However, as discussed in Part III(C)(2), infra, bringing these facts to the jury's attention was not necessarily in petitioner's interest, as a jury might have concluded that petitioner conveyed the location of the body to Laura Portal, or that petitioner and Laura Portal committed the crime as a joint venture.

although the Superior Court made no finding in this regard, the Appeals Court found:

> [A] more likely line of defense chosen by counsel, i.e., that there was computerized evidence that the Chevy Lumina in which the victim's body was found had been seen in a location other than the Enterprise Rent-a-Car parking lot during the three months that elapsed between the victim's disappearance and the discovery of the body, depended on expert testimony regarding the computerized evidence that was to be provided by Sergeant Palladini. It follows that the defendant would hardly have been helped by evidence that challenged his expert witness's credibility.

Id. Petitioner challenges these factual findings.

Petitioner first challenges the finding that "a more likely line of defense" involving computerized evidence of queries regarding the license plate of the victim's car "depended on expert testimony regarding the computerized evidence that was to be provided by Sergeant Palladini." Id. There is no dispute that this defense did in fact depend on the testimony of a person qualified to explain the computerized records. The Appeals Court found that this testimony "was to be provided by Sergeant Palladini." See id. The court does not understand this finding to mean that Palladini was the only qualified witness available at the time of trial.[5] Rather, the court understands this finding to mean that trial counsel intended the testimony to be provided by Palladini. Such a finding is supported by trial counsel's

---

[5] Such a finding would be erroneous. Trial counsel testified that another expert in the computerized records was available at trial. See SA Ex. 21 at 97-107.

testimony at the post-conviction evidentiary hearing that he decided to use Palladini to introduce the records rather than for some other purpose.[6]  See SA Ex. 21 at 112.

Petitioner also challenges the finding that "no relationship between Laura [Portal] and [Palladini] existed," which the court understands in context to refer to a sexual or romantic relationship.  See Whitney II, 826 N.E.2d at 225.  As previously stated, the victim was reported missing on December 4, 1997, and his body was not recovered until about three months later.  See id. at 223.  Lieutenant Semerjian testified that Palladini was in charge of the victim's missing person investigation.  See SA Ex. 22 at 85.  He also testified that Palladini sat in on at least one interview with Laura Portal, and Palladini's testimony makes clear that this occurred after Laura Portal had become a suspect in the murder investigation.  Id. at 93, 109-110, 123.

Sergeant Kevin Shea testified that, subsequently, letters addressed to "Joe" were recovered from Laura Portal's car.  See SA Ex. 21 at 195-96.  Detective Peter Curran testified that the letters were recovered on March 17, 1998, when Laura Portal was hospitalized after leaving phone messages that suggested she might

---

[6]Petitioner alleges that trial counsel's decision to use Palladini to introduce records rather than to introduce evidence of an inappropriate relationship between he and Laura Portal (suggesting a tainted investigation and Laura Portal's guilt) constituted ineffective assistance.  The court addresses these allegations in Part III(C)(2), infra.

harm herself.  <u>See</u> SA Ex. 22 at 68, 70.  The letters appear to reference a romantic or physical relationship between Laura Portal and "Joe."[7]  <u>See</u> SA Ex. 2 at 51-67.  Detective Curran testified that, when he questioned Laura Portal about the letters, she admitted that the letters referred to "Joe" Palladini and that she had engaged in a sexual relationship with Palladini.  <u>See</u> SA Ex. 22 at 72-73.  Lieutenant Semerjian testified that this information resulted in Palladini being questioned by the State Police.  <u>Id.</u> at 91.  Sergeant Shea testified that, when he subsequently questioned Palladini about these allegations, Palladini admitted that he had received cards or letters from Laura Portal (including a birthday card) but had not retained them, that he had told Laura Portal his birthday, that he had given a sympathetic ear when she called him crying, that on a couple of occasions she had hugged him and he reciprocated, and that Laura Portal had left messages on his voicemail.  <u>See</u> SA Ex. 21 at 199-205.

Lieutenant Semerjian testified that, as a result of this information, Palladini was ordered to cease his involvement in the case and to refrain from discussing the case with anyone without prior permission from his supervisors.  <u>See</u> SA Ex. 22 at 96.  He further testified that Palladini violated this order by speaking

---

[7]For example: "I miss the soothing tone of your voice, the comfort of your smile and the touch of your skin."; "I really can't begin to tell you how much I miss you, not just the lover part."

about the case with a newspaper reporter and that Palladini's statement communicated a belief that Laura Portal was not responsible for the victim's murder.   See id. at 97-99.   He testified that, as a result of this unauthorized communication with the media, Palladini was given a five-day suspension.   Id. at 99.

Consequently, there was evidence from which a finder of fact might conclude that a romantic or sexual relationship existed between Laura Portal and Palladini.   However, there was also substantial evidence to the contrary, specifically the testimony of Palladini himself.   Palladini testified that, after he was assigned to investigate Laura Portal's report that her husband was missing, he visited Laura Portal's home to get basic information about the victim and spoke with Laura Portal for about half an hour, after which he interviewed several neighbors.   See SA Ex. 22 at 105-06. He testified that he returned to Laura Portal's home a few times over the next week, and after that spoke with her mostly by telephone.   Id. at 106.   He testified that he visited Laura Portal's home in January, 1998, to speak with her about the investigation, and went to her home once or twice in February, 1998, as well.   Id. at 113.   He testified he went to her home perhaps five times during the three month period, each time to collect information about the victim, and that she came to the police station perhaps twice.   SA Ex. 23 at 17, 18.   He testified that he spoke with Laura Portal on the telephone once or twice week

during this time and that she called him at the police station, rather than at home.  See id. at 19, 41.  He testified that this contact was normal in a missing person investigation, see SA Ex. 23 at 39, and that he did not suspect foul play before the victim's body was discovered.  S.A. Ex. 22 at 114.

Palladini admitted to various other forms of contact with Laura Portal during the investigation.  He stated he exchanged beeper numbers with her, id. at 116, received some voicemail messages from her, id. at 106, gave her hug to console her when she was tearful, which he had done with other witnesses, id. at 120, 122; SA Ex. 23 at 28-29, and, when she asked him when his birthday was, told her his birthday was in March.  SA Ex. 22 at 120.  He admitted that he received a package of birthday cards from Laura Portal at some time in March, 1998, possibly in late March after the discovery of the victim's body, and that he threw them away. SA Ex. 22 at 108-09, 111-12.  He also admitted that he violated orders by speaking to the media about the investigation and explained that he did so because he was upset that the newspaper was falsely reporting that he had a romantic relationship with Laura Portal.  See id. at 126-27.  On multiple occasions during his testimony, Palladini denied having had a sexual or romantic affair with Laura Portal.  See id. at 118, 128, 129; SA Ex. 23 at 41, 45.

Additionally, as the Appeals Court noted, there was no evidence that Palladini ever sent letters to Laura Portal.  See SA

Ex. 23 at 42 (Palladini denying writing any letters to Laura Portal). There was also no evidence that Laura Portal had ever mailed the suggestive letters recovered by the police, as these letters were found in her possession. Indeed, the credibility of the statements in the letters, and of Laura Portal's later statements to police about her relationship with Palladini, is undermined by the tone of the letters, which suggests that Laura Portal was emotionally disturbed and possibly suicidal. See SA Ex. 2 at 51-67.

In light of all the evidence carefully collected by the presiding judge, and after thoroughly reviewing the record, the court concludes that, while a finder of fact might reasonably have found that a sexual or romantic relationship existed between Palladini and Laura Portal, a finder of fact might also reasonably have credited Palladini's testimony and found that no such relationship exited. The question presented was largely one of credibility, which is "reserved in almost every circumstance for the trier." See Sanna, 265 F.3d at 10. "That a different factfinder might have reached a different conclusion is not sufficient to reverse the state court's determination on habeas review." DeBurgo, 587 F.3d at 72. Rather, petitioner must rebut the relevant factual determination by clear and convincing evidence. See id. at 71. Consequently, although petitioner may have presented a competitive question to the original factfinder,

he has failed to overcome the deference due to the state courts' factual determinations on habeas review because he has not presented clear and convincing evidence to the contrary and because particular deference is due to the credibility determinations at the heart of this particular finding. See DeBurgo, 587 F.3d at 71-72; Sanna, 265 F.3d at 10.

Accordingly, for all the foregoing reasons, with respect to facts based on both trial testimony and evidence presented in the post-conviction proceedings, petitioner has failed to rebut the presumption of correctness due the state courts' findings of fact. See §2254(e)(1). He consequently has failed to show that his claims were adjudicated based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See §2254(d)(2); DeBurgo, 587 F.3d at 72. Ground One is being denied.

C.    Grounds Two Through Five: Decisions Contrary to, or Involving Unreasonable Application of, Clearly Established Federal Law

Section 2254(d)(1) provides that habeas relief is appropriate if the state courts' adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

A state court decision is "contrary to" clearly established

federal law if the state court applies a legal rule that contradicts the governing law set forth in the Supreme Court's cases or if the state court confronts facts that are materially indistinguishable from those presented in a decision of the Supreme Court but reaches a different result. See Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Gaskins v. Duval, 640 F.3d 443, 451-52 (1st Cir. 2011). "[A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably with §2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406.

A state court decision involves "an unreasonable application of" clearly established federal law (1) if "the state court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case;" or (2) if "the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams, 529 U.S. at 407. "The ultimate question on habeas . . . is not how well reasoned the state court decision is, but whether the outcome is reasonable." Hurtado v. Tucker, 245 F.3d 7, 20 (1st Cir. 2001).

"A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly

established federal law was objectively unreasonable." Williams, 529 U.S. at 409; see Gaskins, 640 F.3d at 451-52 (same). "[A]n unreasonable application of federal law is different from an incorrect application of federal law." Williams, 529 U.S. at 410. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly," but rather may only grant relief when that application was "also . . . unreasonable." Id. at 411; see Jewett v. Brady, 634 F.3d 67, 74-75 (1st Cir. 2011)("'[S]ome increment of incorrectness beyond error is required' to establish an unreasonable application of federal law." (quoting McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002))). Thus, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011)(quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)); Britto v. Ficco, C.A. No. 01-11445, 2011 WL 1560922, at *4 (D. Mass. Apr. 23, 2011)(Gertner, J.)("The state court must not just be wrong - but very, very wrong.").

"The standard for habeas relief is 'meant to be' difficult to meet, since federal habeas corpus review of state court decisions 'is a guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction

through appeal." Jewett, 634 F.3d at 75-76 (quoting Harrington, 131 S. Ct. at 786).   As described below, although petitioner's claims present serious questions, the court, bound to presume correct the state courts' findings of fact absent clear and convincing evidence to the contrary, cannot say that the state courts' resolution of these claims was contrary to, or involved an unreasonable application of, clearly established federal law.   See §2254(d)(1).   Grounds Two through Five are, therefore, being denied.

## 1.   Ground Two: Sufficiency of the Evidence

A challenge to the sufficiency of the evidence invokes the "federal constitutional rule . . . based on the due process clause of the Fourteenth Amendment and set forth in Jackson v. Virginia, 443 U.S. 307, 313-16 (1979)." Sivo v. Wall, 644 F.3d 46, 50 (1st Cir. 2011); see Tash v. Roden, 626 F.3d 15, 19-20 (1st Cir. 2010); O'Laughlin v. O'Brien, 568 F.3d 287, 300-01 (1st Cir. 2009).   "The standard under Jackson is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Sivo, 644 F.3d at 50.

"'The Jackson standard is as easy to articulate as it is difficult to apply.'" O'Laughlin, 568 F.3d at 300 (quoting Newman v. Metrish, 543 F.3d 793, 796 (6th Cir. 2008)).   "In practice habeas review under Jackson . . . is reserved for unusual cases and

its standard 'is rarely met where there is plausible evidence to support a verdict.'" Sivo, 644 F.3d at 50 (quoting Tash, 626 F.3d at 20). "Put differently, Jackson applies where there is no substantial evidence of guilt or where the evidence amounts to little more than colorable speculation." Id. Thus, as in other contexts, demonstrating that a state court's Jackson analysis was unreasonable requires a petitioner to overcome an "extremely high bar." See O'Laughlin, 568 F.3d at 305.

"'[B]eyond a reasonable doubt does not require the exclusion of every other hypothesis; it is enough that all reasonable doubts be excluded.'" Sivo, 644 F.3d at 51 (quoting Stewart v. Coalter, 48 F.3d 610, 616 (1st Cir. 1995)). Circumstantial evidence can be sufficiently substantial to overcome reasonable doubt. See id. at 50. "[H]owever, some degree of intellectual rigor is required; a reviewing court should not give credence to 'evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.'" Leftwich v. Maloney, 532 F.3d 20, 23 (1st Cir. 2008)(quoting United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995)); see O'Laughlin, 568 F.3d at 301 (stating that reliance on circumstantial evidence is permissible, but that "there are some limits to its probative value").

Here, petitioner claims that his constitutional rights were violated because "there was no evidence presented to the jury upon which they could rationally conclude beyond a reasonable doubt that

24

[petitioner] committed an act causing the death of [the victim] with legal malice."  Mem. in Support at 19.

Addressing this claim, the Appeals Court wrote:

Applying the principle that the evidence supporting conviction is sufficient if any rational juror could have found the essential elements of the crime beyond a reasonable doubt, see Commonwealth v. Latimore, 378 Mass. 671, 677-678, 393 N.E.2d 370 (1979), we review the evidence that the jury could have credited. In early December, 1997, the defendant asked his friend, Thomas Pratt,[FN1] an acquaintance for more than twenty-five years, for a ride that evening. Pratt met the defendant in Natick at approximately 6:30 p.m., and they drove in Pratt's automobile for about forty minutes to the Hopedale-Mendon area.[FN2] They then continued to a restaurant in Milford, where they purchased food and ate in Pratt's car. The defendant stated that it was still too early to leave, and the men waited an additional one-half hour. They then left, driving on Route 109 in the direction of Millis and Franklin.

> FN1. Pratt subsequently testified against the defendant under a grant of immunity.

> FN2. There was evidence that the men stopped at this point to purchase cocaine for their own use.

At one point, the defendant directed Pratt to leave Route 109 and drive up a hill. They continued driving for two to three miles, at which time the defendant told Pratt to stop. They had, by this time, arrived at a location approximately 200 to 300 feet away from the home of the victim, Alberto. The defendant got out of the car and instructed Pratt to meet him in one-half hour at the Sportsmen's Lounge in Millis. Pratt did as he was told and drove to the Sportsmen's Lounge.

Approximately one hour later, the defendant arrived at the lounge and stated that he had to drop a car off and needed Pratt to follow him in his automobile. The defendant, now driving the other automobile, headed down Route 109 toward Medfield, with Pratt following. To avoid a traffic jam caused by an accident on Route 109, the defendant, with Pratt continuing to follow, made a

U-turn, left Route 109, and headed to Norwood on Route 1. He entered an Enterprise Rent-a-Car parking area, drove to the back of a building, and parked. He then got back into Pratt's car.

Pratt drove the defendant to the defendant's ex-wife's home. While the defendant seemed neither nervous nor upset, he spoke little during the ride. However, upon reaching his ex-wife's home, but before getting out of the car, he told Pratt that if anyone, especially the police, inquired, he (Pratt) should say that they had spent the night drinking at the American Legion Hall in Natick.

Both Alberto and a Chevy Lumina automobile registered in his name with license plate number 901-WOR were reported missing as of December 4, 1997. Approximately three months later, the Chevy Lumina registered to the victim was located by police in the Enterprise Rent-a-Car parking area. The victim's partially decomposed body was found in the trunk. It was subsequently determined that death had been caused by blunt head trauma approximately three months earlier. Pratt identified the spot at which the defendant had left the vehicle he had driven in early December. In addition, Pratt took the police to the area near the Portal home at which he had dropped off the defendant.

The victim had been employed by Consolidated Delivery & Logistics as a line haul driver operating between Massachusetts and Connecticut. His supervisor testified that he was never late for work. His regular shift began in Walpole at 10:00 p.m. and the drive from his home to the Walpole site took about twenty minutes. When he did not appear at work on the night of December 4, 1997, his employer's dispatcher telephoned the Portal residence shortly after 11:00 p.m. and apparently awakened the victim's wife, Laura Portal (Laura). Told that Alberto had not reported to work, she stated that he had left the house at 9:30 p.m.[FN3]

> FN3. The statement was admitted over objection as a spontaneous utterance. See section 4, infra.

The defendant had had a previous relationship with Laura resulting in the birth of a son. About two months before Alberto's disappearance, the defendant told a

friend, Tammy Buffum, that he was seeing Laura more frequently. Buffum in fact accompanied the defendant to the victim's house in early December, 1997, so that he could visit his son and bring him a present. On the way to the house, the defendant informed Buffum that the victim had broken his son's arm. After the visit (during which Buffum remained in the car), he informed her that his son's arm was only sprained, but that the victim did not treat the boy well.

Following Alberto's disappearance, the defendant met or visited with Laura on several occasions, and spoke to her on the telephone regularly. On March 13, 1998, the defendant was arrested. As he was led from his home by police, he stated: "I'm not a murderer. I didn't dump no body. I just dropped a car off."

The above-described chain of circumstantial evidence was sufficient to convict. In arguing otherwise, the defendant relies on the proposition that evidence of a defendant's presence at a crime scene, motive, and consciousness of guilt is not enough, even in combination, to sustain a guilty verdict. See Commonwealth v. Curtis, 318 Mass. 584, 585-587, 63 N.E.2d 341 (1945); Commonwealth v. Salemme, 395 Mass. 594, 599-602, 481 N.E.2d 471 (1985); Commonwealth v. Mazza, 399 Mass. 395, 398-400, 504 N.E.2d 630 (1987). That proposition may well be true, but it is inapplicable here because there was considerable additional evidence as well. The jury were entitled to credit not only Pratt's testimony that he drove the defendant to a location within two to three hundred feet of the victim's house, but also the evidence that, on the night the victim was determined to be missing, the defendant left that area in a car matching the description of a vehicle subsequently identified as belonging to the victim; the defendant deposited the car at the Enterprise Rent-a-Car parking lot; and the car, with the victim's decomposing body in the trunk, was discovered in the same spot three months later. In addition, the jury could permissibly find that the defendant, with Pratt's unwitting assistance, timed his arrival at the victim's residence to coincide with the victim's routine of leaving for work at a particular hour. When motive (reconciliation with Laura; anger at the victim's treatment of his son) and consciousness of guilt (the defendant's spontaneous declaration to the police that he had just dropped a car off; his instruction to Pratt to lie about their activities on

that day) are added, the evidence in its totality, evaluated in the light most favorable to the Commonwealth, satisfies the <u>Latimore</u> criteria.

The defendant's argument rests largely on what he maintains is an absence of evidence of guilt. This is not the calculus; it is the sufficiency of the evidence that is in fact introduced that is to be determined. Whether allegedly absent evidence detracts from evidence that is otherwise adequate to support a guilty verdict raises questions of credibility and weight that are for the jury to resolve. <u>See</u> <u>Commonwealth v. Martino</u>, 412 Mass. 267, 272-273, 588 N.E.2d 651 (1992). The absence of forensic evidence, particularly given the defendant's opportunity to dispose of blood or a weapon, does not alter the conclusion that other evidence was sufficient for a determination of guilt. The defendant's contention that there was no evidence of motive[FN4] or opportunity to commit the crime, and little, if any, evidence of consciousness of guilt, is simply wrong.

> FN4. Motive is, in any event, not a necessary element of the crime of murder. <u>See</u> <u>Commonwealth v. Van Liew</u>, 14 Mass. App. Ct. 662, 668, 441 N.E.2d 796 (1982).

The defendant complains that there was a lack of evidence that he knew of the victim's routine of leaving his home about 9:30 p.m., and that accordingly it could not be inferred that he timed his arrival at the residence to coincide with the victim's departure. However, given the evidence of the victim's punctuality in leaving for work, and given the evidence that the defendant intentionally delayed leaving for the victim's residence on the night in question, the jury could permissibly infer that the defendant knew the victim's schedule, and that his timing was knowing and purposeful. Furthermore, in view of the defendant's relationship with Laura, he could well have obtained the information from her.

Finally, Pratt's uncertainty regarding the color of the victim's automobile and the date of the event created issues that the jury resolved adversely to the defendant. We note also that what the defendant characterizes as a Commonwealth "trick" to enter in evidence the date of December 4, 1997 (by means of putting the date in a question to Pratt) passed without objection by the

> defense. Having examined the defendant's various attacks
> on the evidence, we are left unpersuaded that a guilty
> verdict was not warranted.

Whitney II, 826 N.E.2d at 222-24.   Additionally, in denying

petitioner's petition for rehearing, the Appeals Court wrote:

> The petition largely challenges the court's
> determination that the evidence was sufficient to support
> the jury's findings regarding the essential elements of
> the crime beyond a reasonable doubt.  See Commonwealth v.
> Latimore, 378 Mass. 671, 677-678 (1979).   We have
> reviewed the record in light of the defendant's
> objections, and are satisfied that our decision is
> correct.   The defendant attempts to make his case
> essentially by emphasizing testimony favorable to his
> position while ignoring or minimizing adverse testimony,
> and by arguing weight and credibility.

Whitney III, at 1.

Respondent argues that the Appeals Court's decision was

neither contrary to nor an unreasonable application of Jackson.

See Mem. in Opp. at 18.

The Appeals Court's decision was not contrary to clearly

established federal law because it relied on the standard

articulated in Latimore, which in turn adopted the Jackson

standard.   See Leftwich, 532 F.3d at 24 (holding Latimore adopted

Jackson's federal constitutional standard).   Where the state court

applies the correct federal legal rule to facts which are

distinguishable from any Supreme Court case, the state court's

decision does not meet the "contrary" prong of §2254(d)(1).   See

Hurtado, 245 F.3d at 15.

The court also concludes that the Appeals Court's decision was

not an unreasonable application of clearly established federal law. To prove second degree murder, the Commonwealth was required to prove an unlawful killing with malice aforethought, where malice aforethought includes any unexcused intent to kill, to do grievous bodily harm, or to do an act creating a plain and strong likelihood that death or grievous bodily harm will follow. See Commonwealth v. Begin, 474 N.E.2d 1120, 1124 (Mass. 1985); see also Commonwealth v. Grey, 505 N.E.2d 171, 173 n.1 (Mass. 1987)("Malice aforethought may be shown by proof that the defendant, without justification or excuse, intended to kill the victim or to do the victim grievous bodily harm.").  The evidence recited by the Appeals Court, taken in the light most favorable to the prosecution, permitted a rational trier of fact to infer the following beyond a reasonable doubt: On the night of the victim's disappearance, petitioner made arrangements to arrive in the vicinity of the victim's home around the time the victim typically departed for work by car.  Upon arriving, petitioner approached on foot so as not to be detected. The victim did, in fact, leave his home at the usual time that evening, and petitioner killed him with blows to the head before the victim made it into his car.  Petitioner placed the victim's body in the trunk of the victim's car and disposed of any murder weapon and other evidence of the killing.  He then met his unwitting accomplice and, with his help, hid the car by depositing it in the parking lot of a car rental business.  At the conclusion

30

of the evening, petitioner attempted to conceal his guilty conduct by instructing his accomplice to lie about the evening's events if questioned by the police. This sequence of events is sufficient to prove all the necessary elements of second degree murder. See Begin, 474 N.E.2d at 1124.

Admittedly, to make the necessary findings, the jury was required to reason from circumstantial evidence. However, this case is distinguishable from O'Laughlin, where the First Circuit granted relief because the circumstantial evidence of guilt did not permit any reasonable jury to find that the petitioner committed the charged assault. See 568 F.3d at 289, 302. In O'Laughlin, the petitioner was a live-in maintenance worker at a condominium complex, and the victim was a resident of that complex who was attacked and severely injured in her home, probably around 2:00 a.m. See id. at 291. Although there was no eyewitness to the attack, circumstantial evidence of the petitioner's involvement included that petitioner needed money to buy drugs that evening; that he had a master key that provided access to the victim's residence; that, when police arrived in response to a report of a woman screaming, the petitioner was seen outside (clad only in boxer shorts) and reported that he heard a scream and believed it was a racoon caught in a dumpster; that a witness observed several small cuts and bruises of indeterminate age on petitioner's face the following morning; that petitioner removed a red stain from a

31

closet in his own residence before allowing police to search it;
and that a clean bat with small, unidentifiable human blood stains
and with petitioner's name on it was found in the woods near the
complex.  See id. at 290-295.  The court found it unreasonable to
conclude that such evidence was sufficient, particularly in light
of evidence that nothing of value was taken from the victim's
residence, that petitioner did not have exclusive access to the
victim's apartment, that petitioner's purported consciousness of
guilt was likely consciousness of having committed drug crimes
rather than assault, and that the victim's estranged husband may
have been the assailant.  See id. at 302-04.  The court concluded
that this evidence permitted "reasonable speculation that [the
petitioner] was the assailant," but did not permit a finding of
guilt beyond a reasonable doubt.  See id. at 302.  The First
Circuit has since characterized O'Laughlin as a case in which "the
[petitioner] was a highly plausible suspect in a [crime], but there
was no evidence that he had in fact been present - let alone
uniquely present - at the time that [crime] occurred."[8]  See Sivo,
644 F.3d at 51.

In contrast to O'Laughlin, where the evidence merely permitted
an inference that the petitioner was located in the same

---

[8]Sivo refers to O'Laughlin as a "murder" case.  See Sivo,
644 F.3d at 51.  The court assumes this is because one count of
conviction in O'Laughlin was armed assault with intent to murder.
See O'Laughlin, 568 F.3d at 289.

condominium complex in which the crime occurred and conceivably could have committed it, the evidence in this case permitted the jury to reasonably infer that not only was petitioner uniquely present at the actual scene of the killing (the driveway or yard outside the victim's home), but also personally disposed of the victim's body immediately thereafter. Cf. O'Laughlin, 568 F.3d 302-03. Additionally, unlike in O'Laughlin, where evidence of consciousness of guilt was likely to relate to drug crimes rather than assault, the jury in this case, presented with evidence that petitioner disposed of the victim's car and instructed his unwitting accomplice to lie about their location and activities that evening, could conclude that petitioner must have been conscious of the killing rather than of some other crime. Cf. O'Laughlin, 568 F.3d at 303.

On the whole, the court finds the issues presented in this case to be more similar to those presented in Sivo, where the petitioner was convicted of first degree child abuse. See 644 F.3d at 47. Although there was no evidence showing precisely how the child sustained the injury, and although the prosecution failed to rule out all other possible scenarios, the First Circuit found sufficient evidence because the evidence permitted the jury to infer that the victim suffered injuries inconsistent with an accident, that the petitioner was alone with the victim during the time the injury likely occurred, and that there was no other

reasonable explanation for the injury.   See id. at 50-51.
Similarly, here the evidence taken in the light most favorable to
the prosecution permitted the jury to reasonably infer, among other
things, that the victim was killed by an injury that was neither
accidental nor self-inflicted and that petitioner was the only
other person present at the scene of killing; as in Sivo, this was
sufficient.   See id. at 51.

Petitioner largely bases his argument on the absence of
certain forensic evidence linking petitioner to the victim or the
victim's car, as well as on the fact that, after petitioner
disposed of the car, Pratt did not observe petitioner to have a
weapon, to be wearing gloves, or to have bloody or torn clothing.
Mem. in Support at 19-20.   The lack of forensic evidence can tend
to undermine the sufficiency of other evidence where it is
"difficult to fathom" how a petitioner could have committed the
crime without creating such evidence.   See O'Laughlin, 568 F.3d at
304.   The court finds reasonable, however, the Appeals Court's
conclusion that, in this case, the absence of forensic evidence or
direct evidence that petitioner possessed a weapon or bloody
clothing is not fatal to the verdict, given that other evidence was
sufficient to convict and that the jury could have found that
petitioner had time to dispose of blood or a weapon before his
second meeting with Pratt.   See Whitney II, 826 N.E.2d at 224.

Accordingly, for all the foregoing reasons, Ground Two is

34

being denied.

    2.  Ground Three: Ineffective Assistance of Counsel

    "The clearly established federal law governing ineffective assistance of counsel claims is the framework established in [Strickland v. Washington, 466 U.S. 668 (1984)]." Jewett, 634 F.3d at 75.  Under Strickland, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See 466 U.S. at 687-88, 694.  In Massachusetts, "the SJC's standard for ineffective assistance of counsel articulated in Commonwealth v. Saferian, 315 N.E.2d 878, 883 (1974), is the functional equivalent of the Strickland standard." Lynch, 438 F.3d at 48.

    In 2011, in Jewett, the First Circuit stated that "[t]he Supreme Court has recently reinforced the 'doubly' deferential standard that applies to a state prisoner's claims in a federal habeas petition that a state court has unreasonably applied the Strickland principles." Jewett, 634 F.3d at 75.  "[T]he 'pivotal question' in a federal collateral attack under Strickland is not 'whether defense counsel's performance fell below Strickland's standard,' but 'whether the state court's application of the Strickland standard was unreasonable . . . .'" Id. at 75 (quoting Harrington, 131 S. Ct. at 785).  "[T]he Strickland standard is a

35

very general one, so that state courts have considerable leeway in applying it to individual cases."  Id. (citing Harrington, 131 S. Ct. at 786).

In Ground Three, petitioner argues that his counsel was ineffective in three respects: (1) he failed to present evidence that the police investigation into the victim's disappearance was compromised by an inappropriate relationship between Palladini and Laura Portal; (2) he failed to present evidence that Laura Portal was responsible for the victim's death; and (3) he failed to communicate adequately with petitioner because he did not provide petitioner with materials or discuss strategy before trial.

Addressing these claims, the Appeals Court wrote:

> We evaluate the defendant's appellate claims of
> ineffective assistance of trial counsel on the basis of
> the standards, which we will not repeat, set forth in
> Commonwealth v. Saferian, 366 Mass. 89, 96, 315 N.E.2d
> 878 (1974). In his second motion for new trial, the
> defendant accuses his trial counsel of failing to pursue
> available evidence that the police investigation that
> resulted in his arrest was inadequate, see Commonwealth
> v. Bowden, 379 Mass. 472, 485-486, 399 N.E.2d 482 (1980),
> specifically because the police investigator, Sergeant
> Palladini, allegedly had a romantic relationship with the
> victim's wife, Laura, a suspect herself. In a related
> argument, the defendant attacks counsel for failing to
> develop the possibility that Laura committed the murder,
> a so-called "third-party culprit" defense. In addition,
> he asserts that trial counsel failed to consult with him,
> or provide materials to him, prior to trial. The trial
> judge conducted a three-day evidentiary hearing on the
> motion, and thereafter rendered a six-page decision
> supporting his denial.
>
> We pay special deference to a decision on a motion
> for new trial where the motion judge was also the trial
> judge. See Commonwealth v. Myers, 51 Mass.App.Ct. 627,

36

632, 748 N.E.2d 471 (2001). The judge apparently credited Sergeant Palladini's testimony that no relationship between Laura and himself existed. The evidence supports the finding. There were no writings by Sergeant Palladini to Laura. Letters obtained by the police from Laura were apparently either never sent or were ignored. That Sergeant Palladini was removed from the investigation as a result of Laura's allegations, and was subsequently suspended for five days for giving a statement exonerating Laura to a newspaper, does not constitute evidence of a romantic relationship, or permit an inference that Sergeant Palladini thwarted or prejudiced an investigation that would otherwise have pointed away from the defendant.

As the judge indicated, there seems little to recommend a strategy whereby the jury's attention would be focused on Laura as the killer. In the circumstances, an attempt to identify Laura as the perpetrator would almost certainly have implicated the defendant as a joint venturer. That defense counsel did not pursue an extremely high-risk course does not make out a case of ineffective assistance. See Commonwealth v. Alammani, 439 Mass. 605, 613, 790 N.E.2d 222 (2003) (if basis of ineffective assistance claim is tactical error, defendant must demonstrate that tactical judgment was manifestly unreasonable). Furthermore, a more likely line of defense chosen by counsel, i.e., that there was computerized evidence that the Chevy Lumina in which the victim's body was found had been seen in a location other than the Enterprise Rent-a-Car parking lot during the three months that elapsed between the victim's disappearance and the discovery of the body, depended on expert testimony regarding the computerized evidence that was to be provided by Sergeant Palladini. It follows that the defendant would hardly have been helped by evidence that challenged his expert witness's credibility.

With respect to contact, or lack thereof, between trial counsel and the defendant, the judge credited counsel's testimony that he supplied police reports, grand jury minutes, and other documents to the defendant, and that he discussed with the defendant every trial strategy. We accept the motion judge's findings of fact absent clear error. See Commonwealth v. Smiley, 431 Mass. 477, 481, 727 N.E.2d 1182 (2000). We agree with the judge that the defendant was convicted by the evidence, not by reason of ineffective assistance of counsel.

<u>Whitney II</u>, 826 N.E.2d at 224-25.   Additionally, in denying

petitioner's petition for rehearing, the Appeals Court wrote:

> Nor are we persuaded by the defendant's re-argument of the proposition that trial counsel was ineffective because he did not attempt to exploit an alleged romantic relationship between the victim's wife and a police investigator, <u>see</u> <u>Commonwealth v. Bowden</u>, 379 Mass. 472, 485-486 (1980), thereby sacrificing a possible "third-party culprit" defense.  Without revisiting the issue in its entirety, we reiterate our conclusion that the findings of the motion judge, who was also the trial judge, <u>see</u> <u>Commonwealth v. Myers</u>, 51 Mass App. Ct. 627, 632 (2001), were supported by the evidence, and his decision is entitled to special deference.  We repeat as well that trial counsel can hardly be faulted for rejecting a strategy that sought to paint the victim's wife as the killer when that approach would undoubtedly have embroiled the defendant as a likely joint venturer.

<u>Whitney III</u>, at 1-2.

Respondent argues that the Appeals Court's decision was

neither contrary to, nor an unreasonable application of, clearly

established federal law.

The Appeals Court's decision with respect to all three

arguments was not contrary to clearly established federal law,

because the Appeals Court applied the <u>Saferian</u> standard, which is

functionally identical to the federal <u>Strickland</u> standard, and did

not confront facts materially indistinguishable from those in the

relevant cases of the Supreme Court.   See <u>Smiley v. Maloney</u>, 422

F.3d 17, 21 n.2 (1st Cir. 2005).

The court takes petitioner's arguments regarding unreasonable

application of federal law in reverse order.   The court concludes

that none of the arguments is meritorious because the Appeals Court

reasonably concluded that trial counsel's performance was not unreasonable. See Jewett, 634 F.3d at 75.

          a.   Failure to Consult or Provide Materials to Petitioner

Regarding petitioner's claim that his counsel was ineffective for failing to provide petitioner with materials or consult with him regarding trial strategy, the Appeals Court adopted the trial court's findings that trial counsel "supplied police reports, grand jury minutes, and other documents to [petitioner], and that he discussed with the [petitioner] every trial strategy." See Whitney II, 826 N.E.2d at 224-25. Petitioner argues that the court should reject this finding of fact, see Mem. in Support at 28, which the court may only do if it is rebutted by clear and convincing evidence. See §2254(e)(1); DeBurgo, 587 F.3d at 62.

No clear and convincing evidence rebuts the relevant finding. Trial counsel testified that he provided petitioner grand jury minutes and police reports, see SA Ex. 21 at 41-43; SA Ex. 22 at 51, and that he had discussions with petitioner about all matters of trial strategy, including whether to introduce into evidence Laura Portal's letters to Palladini. See SA Ex. 21 at 132-33, 139, 146; SA Ex. 22 at 52, 54, 58. To rebut this evidence, petitioner argues that trial counsel's testimony was not credible, given that he did not keep contemporaneous records of this activity and that a portion of his testimony at the post-conviction evidentiary

hearing was arguably inconsistent with statements he made during the trial.[9]   However, petitioner's argument is essentially an attack on the state courts' credibility determination, which ordinarily cannot be revisited on habeas review.  See Mastracchio, 274 F.3d at 598 (quoting Sanna, 265 F.3d at 10).   Although a different finder of fact may have disbelieved trial counsel's testimony, the court must defer to the state courts' factual finding in this regard, as it rests on a credibility determination and is not otherwise rebutted by clear and convincing evidence. See DeBurgo, 587 F.3d at 72.

Consequently, taking as true that petitioner's counsel did, in fact, provide him with materials and consult with him regarding every trial strategy, the Appeals Court's conclusion that trial counsel was not ineffective in this respect is objectively reasonable.  See §2254(d)(1).

b.  Failure to Present Evidence of Laura Portal's

---

[9]At the post-conviction evidentiary hearing, trial counsel stated that he spoke with Palladini "a number of times," including prior to trial.  See SA Ex. 21 at 71.  In contrast, at trial, when Palladini failed to appear in response to a subpoena, a court officer reported to the judge that Palladini claimed he "received a phone call from [trial counsel] yesterday releasing him from his summons," which prompted trial counsel to exclaim, "I never called him.  I never talked to him in my life, Judge." See SA Ex. 15 at 200.  In context, a finder of fact could reasonably conclude that trial counsel was speaking figuratively when he protested at trial that he had not released Palladini, and that he did not literally mean that he had never spoken to Palladini before.  Thus, a finder of fact could reasonably conclude that the two statements were not inconsistent and did not undermine trial counsel's credibility.

Guilt

Regarding petitioner's claim that his counsel was ineffective for failing to present evidence that Laura Portal was culpable for the killing, the Appeals Court ruled as a matter of state law that the presentation of such evidence would implicate petitioner as a joint venturer with Laura Portal.[10]   See Whitney II, 826 N.E.2d at 224-25.   The court cannot review this conclusion of state law, for it is not the court's place on habeas review to "reexamine state-court determinations on state-law questions."[11]   See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).   Taking as true the Appeals

_____

[10]Trial counsel testified that he understood this dilemma. See SA Ex. 21 at 129.  He stated that he considered whether to inculpate Laura Portal, "who is the lover or ex-lover or continual lover for all I know of [petitioner]," or to focus on attacking the Commonwealth's evidence that petitioner was linked to the victim's car and that the victim was dead in early December.  See id.; see also id. at 146-47 ("Well, I think by pointing to her as another suspect and [petitioner] and I talked it over, it would automatically point to him as a co-conspirator.").

[11]Moreover, the Appeals Court's conclusion is understandable, in that the evidence would not have shown that Laura Portal acted independently of petitioner.  There was evidence in any event that petitioner went to the Portal home on the night of the victim's disappearance and subsequently disposed of the victim's body in the parking lot.  Evidence that Laura Portal knew of the location of the body, that the victim was killed while lying down (as if sleeping), and that petitioner painted the interior of the home after the victim's disappearance may have suggested that the killing took place inside the home, but would also have suggested that it was a collaborative effort between Laura Portal and petitioner.  See Commonwealth v. Ortiz, 679 N.E.2d 1007, 1009 (Mass. 1997)(describing elements of joint participant liability before Commonwealth v. Zanetti, 910 N.E.2d 869, 883-84 (2009)).

41

Court's conclusion of state law, it was reasonable for the Appeals Court to conclude that trial counsel could reasonably decline to introduce evidence of Laura Portal's guilt because doing so would have exposed petitioner to an additional theory of liability for the killing.  See Horton v. Allen, 370 F.3d 75, 86 (1st Cir. 2004)(holding that trial counsel could reasonably decline to present evidence that presented a "possible danger to the defense" because it would have conflicted with the defendant's version of events and would have established a notable change in the defendant's demeanor just prior to the murders in question).

> c. <u>Failure to Present Evidence of Compromised Police Investigation</u>

Regarding petitioner's argument that his counsel unreasonably failed to present evidence that the police investigation was compromised by Laura Portal's romantic or sexual relationship with Palladini, the Appeals Court's decision was not objectively unreasonable.  Taking as true the finding that no such romantic or sexual relationship existed (as the court has already concluded it must), it was objectively reasonable for the Appeals Court to conclude that trial counsel could reasonably decide not to attempt to prove such a relationship.  See United States v. Pellerito, 878 F.2d 1535, 1540 (1st Cir. 1989)(holding counsel reasonably failed to move to suppress evidence where counsel had reason to believe there was no "legitimate shot" at success).  Additionally, for the

reasons described in Part III(C)(2)(b), <u>supra</u>, suggesting that Palladini was attempting to protect Laura Portal would have implied Laura Portal's guilt, which would not have been helpful to petitioner.

Accordingly, for all the foregoing reasons, the Appeals Court's rejection of petitioner's ineffective assistance of counsel claims was not contrary to, or an unreasonable application of, clearly established federal law. <u>See</u> §2254(d)(1). Ground Three is, therefore, being denied.

3.   <u>Ground Four: Coerced Verdict</u>

Regarding jury coercion, clearly established federal law as determined by the Supreme Court "can be summarized as follows: defendants have a right against coerced jury verdicts, and any potential coercion should be measured based on the totality of the circumstances." <u>See</u> <u>Clements v. Clarke</u>, 592 F.3d 45, 57 (1st Cir. 2010)(relying on <u>Lowenfield v. Phelps</u>, 484 U.S. 231 (1988)).[12]

--------

[12]Petitioner relies on <u>Brasfield v. United States</u>, 272 U.S. 448 (1926). In <u>Brasfield</u>, after the jury had deliberated for some hours, the trial court inquired how it was divided numerically. <u>See</u> 272 U.S. at 449. The Supreme Court found this to be error and reversed the conviction. <u>See</u> <u>id.</u> at 450. In doing so, however, the Court did not mention any provision of the Federal Constitution, <u>see generally</u> <u>id.</u>, and the Court has since clarified that <u>Brasfield</u> "was an exercise of this Court's supervisory powers." <u>See</u> <u>Lowenfield</u>, 484 U.S. at 240. Consequently, relief under §2254 is not available based on <u>Brasfield</u>. <u>See</u> <u>Early v. Packer</u>, 537 U.S. 3, 10 (2002)(holding federal jury coercion cases premised solely on supervisory powers rather than constitutional grounds are not a basis for relief under §2254).

In Ground Four, petitioner argues that the trial court violated his Sixth and Fourteenth Amendment rights to an impartial jury by coercing the jury to convict in its supplemental instruction on "common sense," which the trial court gave at the beginning of the fourth day of deliberations.  Petitioner asserts this instruction deprived petitioner of "his Sixth and Fourteenth Amendment right to a fair trial before an impartial jury contrary to well established federal constitutional law."  Mem. in Support at 31.

Addressing this claim, the Appeals Court wrote:

We address briefly the defendant's objection to remarks by the judge to the jury in the course of jury deliberations. At the commencement of the fourth day of deliberations, the judge stated:

"Common sense, just briefly, folks, is something that you don't get by getting three Ph.D.s and become this and become that. That's something we learn from the day that we're born from our mother and father, and as we go through life. A person could have twenty Ph.D.s, a Phi Beta Kappa or whatever, and not have an ounce of it, and a person who went to the second grade, or was an immigrant can be chuck loaded with it."

The defendant objected unsuccessfully and subsequently moved for a mistrial. That motion was denied. Two hours after the statement at issue, the jury returned a verdict of murder in the second degree.

The defendant argues that the statement had a coercive effect on the jury, see Commonwealth v. Rodriguez, 364 Mass. 87, 98, 300 N.E.2d 192 (1973); Commonwealth v. Connors, 13 Mass. App. Ct. 1005, 1006, 433 N.E.2d 454 (1982), particularly given that two members of the jury were in fact holders of Ph.D. degrees. Put differently, he contends that the remarks

44

invited the jury to discount the views of those
individuals. In further support of his position, he
observes that the return of a verdict a scant two hours
after the statement (following three previous days of
deliberation without a verdict) indicated that the
remarks indeed influenced the jury in favor of a finding
of guilt.[FN5]

> FN5. At a hearing on the defendant's motion
> for a mistrial, defense counsel referred to a
> previous "problem" with one of the jurors who
> held a Ph.D. degree, apparently implying that
> that juror might have been a "hold out" for
> acquittal. The judge correctly observed that
> there was no basis for drawing any conclusion
> regarding any juror's views. The argument has,
> for good reason, been abandoned on appeal. In
> any event, we note that any inferential
> denigration of people with advanced degrees
> would hardly be likely to influence the votes
> of those who were the subject of the comment.

The defendant's proposition is premised on an
eccentric reading of the judge's statement. Nothing in
his remarks suggests an equation between higher education
and lack of common sense. The statement was plainly
calculated to remind the jurors that they should evaluate
the evidence in the light of their own common sense and
life experiences, see Commonwealth v. Mutina, 366 Mass.
810, 820, 323 N.E.2d 294 (1975), and that common sense
was not necessarily a function of education. The
statement would not have been misconstrued by a rational
juror. That the jury returned a verdict two hours after
the statement is irrelevant. The amount of time that
elapses between a judge's remarks and a verdict does not,
by itself, support a conclusion that the remarks were
coercive. See Commonwealth v. Moore, 359 Mass. 509, 516,
269 N.E.2d 636 (1971).

Whitney II, 826 N.E.2d at 225-26.[13]

---

   [13]Petitioner does not argue that the Appeals Court failed to
adjudicate his federal claim on the merits and that the claim
therefore is subject to de novo review. Rather, he asserts that
the Appeals Court's decision was "contrary to well established
federal constitutional law." See Mem. in Support at 31. In any
event, "a state-court adjudication of an issue framed in terms of

Respondent argues that the Appeals Court's decision was not contrary to, or an unreasonable application of, clearly established federal law, and that, in any event, any error was harmless.

The Appeals Court's decision was not contrary to clearly established federal law because, although it did not expressly cite or articulate the federal standard, it did not apply a rule that contradicts the governing law set forth in Supreme Court precedent. See Early, 537 U.S. at 8.  The First Circuit has characterized Lowenfield's relevant language as "scant precedent on which to hang [a] §2254 claim" and as "primarily dicta, which by definition is not clearly established law." Clements, 592 F.3d at 57.  "Because the Supreme Court has established so little in the way of a constitutional rule governing" jury coercion by state trial courts,

state law may receive section 2254(d)(1) deference so long as the state standard is at least as protective of the defendant's rights as its federal counterpart." Leftwich, 532 F.3d at 23-24. Here, the state court relied on its decision in Connors, which prohibits instructions that have "an undue coercive effect" and "require[s] a case-by-case determination of coercion." See 433 N.E.2d at 455-56.  That standard is functionally identical to the standard established by Lowenfield, which requires that a court determine whether "the jury was improperly coerced" by examining the supplemental charge in its context and based on the totality of the circumstances. See 484 U.S. at 550.  Accordingly, because the state applied a standard at least as protective as the federal jury coercion standard, the federal claim was adjudicated on the merits.  See Leftwich, 532 F.3d at 23-24; see also Foxworth, 570 F.3d at 426 ("[A] state-court adjudication of an issue framed in terms of state law is nonetheless entitled to deference under section 2254(d)(1) as long as the state and federal issues are for all practical purposes synonymous and the state standard is at least as protective of the defendant's rights as its federal counterpart.").

"there is equally little for a state court to contradict." See id.
Here, as in Clements, "[t]here is nothing to suggest that the
[Appeals Court] . . . ran afoul of this standard in reviewing the
trial judge's actions." See id. Rather, it considered the
totality of the circumstances to determine whether the instruction
was inappropriately coercive in a manner consistent with the
federal standard articulated in Lowenfield.[14] See Early, 537 U.S.
at 8. Accordingly, the court concludes that the Appeals Court's
decision was not contrary to clearly established federal law. See
id.; Clements, 592 F.3d at 57.

The Appeals Court's decision also was not an unreasonable
application of clearly established federal law. See Clements, 592
F.3d at 57. As the First Circuit has explained, "'evaluating

---

[14]Although the Appeals Court stated that the fact that the
jury returned a verdict two hours after the instruction was
"irrelevant," it did not fail to consider this factor in the
totality of the circumstances. See Whitney II, 826 N.E.2d at
225-26. It recited the fact in explaining the circumstances
surrounding the instruction, and, read in context, the
"irrelevant" remark appears to mean that the return of the
verdict shortly after an otherwise permissible instruction did
not, by itself, establish unconstitutional coercion on the facts
of this case. See id. This position is consistent with Supreme
Court precedent regarding cases in which there is little
indication that the jury deadlocked before the supplemental
instruction was given. See Lowenfield, 484 U.S. at 240 (stating,
where eleven jurors indicated further deliberations would be
helpful in obtaining a verdict shortly before the supplemental
instruction was given, that a verdict soon after the supplemental
instruction merely "suggests the possibility of coercion"). This
was not a case like United States v. U.S. Gypsum Co., in which a
rapid resolution followed "positive prior indications of hopeless
deadlock" and therefore "[gave] rise to serious questions." See
438 U.S. 422, 462 (1978).

whether a rule application was unreasonable requires considering the rule's specificity,'" and, therefore, "'[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" Id. (quoting Yarborough, 541 U.S. at 664). By this reasoning, "Lowenfield's totality-of-the-circumstances test, to the extent that it constitutes clearly established federal law to begin with, allows for a great deal of leeway." Id. Here, the Appeals Court evaluated the trial court's instruction in context and found that it was not improperly coercive, but rather conveyed a permissible and appropriate message. See Whitney II, 826 N.E.2d at 225-26. Its conclusion was understandable in the circumstances, as the instruction suggested the jurors could participate in deliberations regardless of their level of education, did not state that all educated people lack common sense, and was made in the absence of any indication that the more highly educated jurors were leaning towards acquittal or were holdouts in the ongoing deliberations. See id. Regardless of whether this court would have reached the same conclusion as the Appeals Court if reviewing the matter in the first instance, the Appeals Court's decision was not unreasonable given the "great deal of leeway" due the state courts in adjudicating jury coercion claims. See Clements, 592 F.3d at 57.

Accordingly, for all the foregoing reasons, Ground Four is being denied.

4.   <u>Ground Five: Confrontation</u>

The parties agree that the federal law governing this claim is articulated in <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), which establishes a standard for violations of the Sixth Amendment's Confrontation Clause.   Under <u>Crawford</u>, "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." <u>Id.</u> at 68.   Although <u>Crawford</u> held that "[s]tatements taken by police officers in the course of interrogations are . . . testimonial," <u>see</u> <u>id.</u> at 52, the Court in <u>Crawford</u> "specifically left for another day any effort to spell out a comprehensive definition of 'testimonial,' and acknowledged that 'our refusal to articulate a comprehensive definition in this case will cause interim uncertainty.'" <u>Likely v. Ruane</u>, 642 F.3d 99, 102 (1st Cir. 2011)(quoting <u>Crawford</u>, 541 U.S. at 68 & n.10).   In any event, the admission of statements in violation of the Confrontation Clause is subject to harmless error analysis. <u>See</u> <u>Crawford</u>, 541 U.S. at 76 (Rehnquist, C.J., concurring in the judgment)("Likewise to the Court's credit is its implicit recognition that the mistaken application of its new rule by courts which guess wrong as to the scope of the rule is subject to harmless-error analysis."); <u>United States v. Earle</u>, 488 F.3d 537, 542 (1st Cir. 2007)(citing <u>Olden v. Kentucky</u>, 488 U.S. 227, 232 (1988)).

Here, petitioner claims that his constitutional right of confrontation was violated because "the trial court impermissibly allowed the [C]ommonwealth to present hearsay, testimonial evidence under guise of a spontaneous utterance of a statement made by Laura [Portal] to CDL dispatcher Dunbar that [the victim] left his house at 9:30 p.m. on the night of December 4, 1997, the date the [C]ommonwealth alleged [the victim] went missing." Mem. in Support at 31.

Addressing this claim, the Appeals Court wrote:

The judge admitted, under the spontaneous utterance exception to the hearsay rule, testimony of the dispatcher, Vernon Dunbar, that he called the Portal residence a little after 11:00 p.m. on December 4, 1997; spoke to Laura who, he believed, had been sleeping; and informed her that Alberto had not arrived at work. To this, Laura replied that Alberto had left home at 9:30 p.m. The defendant initially challenges the admission of Laura's statement on the ground that the judge abused his discretion in the circumstances, because Laura's statement did not qualify as a spontaneous utterance. We disagree.

The trial judge has considerable discretion in deciding on the admissibility of statements on a spontaneous utterance exception. See Commonwealth v. McLaughlin, 364 Mass. 211, 223-224, 303 N.E.2d 338 (1973); Commonwealth v. Mendrala, 20 Mass.App.Ct. 398, 401, 480 N.E.2d 1039 (1985). A spontaneous utterance is one that responds to an occurrence or event that is "sufficiently startling to render inoperative the normal reflective thought processes of the observer," producing "a spontaneous reaction to the occurrence or event [which is] not the result of reflective thought." Commonwealth v. Santiago, 437 Mass. 620, 623, 774 N.E.2d 143 (2002), quoting 2 McCormick, Evidence § 272, at 204 (5th ed.1999). Whether the statement tended to "qualify, characterize and explain the underlying event," Commonwealth v. Crawford, 417 Mass. 358, 362, 629 N.E.2d 1332 (1994), is not an independent foundational element,

but merely one of many factors to be considered in assessing whether the statement was truly made without reflection, including the various relationships among the startling event, the utterance generated by it, the prior event about which the statement comments, and the time between the startling event and the statement. See Commonwealth v. Santiago, supra at 625-626, 774 N.E.2d 143.

Here, the dispatcher's telephone call after 11:00 p.m. announcing that Laura's husband, known for his punctuality in arriving at work, had not appeared for his scheduled shift could be found to be a startling event that could trigger a spontaneous response. That the response was in fact spontaneous is supported by the dispatcher's testimony that it appeared that Laura had been awakened by the call, and that she sounded worried and concerned at being informed that her husband had not shown up at the regular time. If, as the defendant argues, Laura had a motive to lie, the credibility of the utterance was for the jury to determine. See Commonwealth v. Moquette, 439 Mass. 697, 706, 791 N.E.2d 294 (2003). "[A] victim's motive or lack thereof should play no part in the calculus of determining admissibility of the statements." Commonwealth v. Joyner, 55 Mass.App.Ct. 412, 416, 771 N.E.2d 193 (2002). Taking all relevant factors into account, the judge could permissibly deem Dunbar's testimony repeating Laura's statement admissible.

Following the filing of the Commonwealth's brief in this court, the Supreme Court decided Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In a reply brief, the defendant argues that the admission of Laura's out-of-court statement violated the principle, enunciated in Crawford, that the confrontation clause of the Sixth Amendment to the United States Constitution prohibits, at least in criminal cases, the use of out-of-court "testimonial statements" unless the declarant is unavailable and there has been opportunity for cross-examination of the declarant with respect to the proffered statements. Id. at 59-64, 124 S.Ct. 1354. The Supreme Court majority passed on the question of what constitutes a testimonial statement for this purpose. Id. at 68, 124 S.Ct. 1354 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial' ").

We leave the ambiguities of Crawford v. Washington,

supra, to clarification by others, for we resolve the issue in this case on a narrower ground. Even were Laura's out-of-court statement inadmissible, either because it was not a spontaneous utterance or because it violated the holding of Crawford, the error in admitting it was harmless. Despite Crawford's constitutional strictures, improper admission of statements apparently remains subject to harmless-error analysis. Id. at 76, 124 S.Ct. 1354 (Rehnquist, C.J., concurring). That being so, we apply our traditional rule that the erroneous admission of hearsay does not require reversal where the hearsay is merely cumulative of other properly admitted evidence. See Commonwealth v. O'Connor, 407 Mass. 663, 670, 555 N.E.2d 865 (1990); Commonwealth v. Dunn, 56 Mass.App.Ct. 89, 94-95, 775 N.E.2d 745 (2002). Here, there was other evidence that the victim regularly reported for work at 10:00 p.m., took about twenty minutes to drive to work, and was uncommonly punctual. The jury could permissibly infer without Laura's statement that Alberto left his residence at approximately 9:30 p.m. on the night in question.

Whitney II, 826 N.E.2d at 226-28.

Responding to petitioner's claim, respondent argues that the Appeals Court's decision was not contrary to Crawford, that the Appeals Court's application of Crawford was reasonable, and that, even if the Appeals Court's decision was unreasonable, any error was not sufficiently prejudicial to justify relief under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). Respondent also argues, albeit in a footnote, that Crawford did not clearly establish that the Confrontation Clause prohibits the introduction of spontaneous utterances without unavailability and a prior opportunity for cross-examination. See Mem. in Opp. at 38 n.13.

Because the circumstances of this case are materially indistinguishable from those in Likely, this Ground is being denied

because the Supreme Court had not clearly established federal law regarding whether spontaneous utterances are testimonial during the relevant time period.  <u>See</u> <u>Likely</u>, 642 F.3d at 102.  In 2011, in <u>Likely</u>, the petitioner had been convicted in state court in 2002 of distributing cocaine.  <u>See</u> <u>id.</u> at 100.  The conviction was based in part on the admission at trial of a chemical certificate of analysis with an affidavit but without the testimony of the chemist.  <u>See</u> <u>id.</u>  During the pendency of the petitioner's direct appeal, the Supreme Court decided <u>Crawford</u>, and the petitioner relied on <u>Crawford</u> in arguing that the admission of the certificate without live testimony violated his right of confrontation.  <u>See</u> <u>id.</u>  On habeas review, petitioner again raised this claim.  <u>See</u> <u>id.</u> at 101.  The First Circuit held that, "during the relevant period, there was no 'clearly established Federal law, as determined by the Supreme Court of the United States,' [§2254(d)(1)], as to whether admission of this evidence without the chemist being a witness violated the Confrontation Clause."  <u>Id.</u> at 102.  Specifically, the court reasoned:

> We reject Likely's argument that the analysis in <u>Crawford</u> clearly established that the Confrontation Clause barred the procedure used here in the state court. The phrase "clearly established Federal law" refers to holdings, as opposed to dicta, as of the time of the relevant state court decision. <u>Williams</u>, 529 U.S. at 412. <u>Crawford</u> contained no holding that supports Likely's petition. In <u>Crawford</u>, the Supreme Court specifically left "for another day any effort to spell out a comprehensive definition of 'testimonial,' " and acknowledged that "our refusal to articulate a comprehensive definition in this case will cause interim uncertainty." <u>Crawford</u>, 541 U.S.

at 68 & n. 10. The issue presented in this case was exactly one of those areas of uncertainty. When the Supreme Court itself acknowledges that an issue has not been resolved and is fairly debatable, there is no argument left that the state court's decision is contrary to or an unreasonable application of "clearly established" Supreme Court precedent. Foxworth, 570 F.3d at 436; L'Abbe v. DiPaolo, 311 F.3d 93, 98 (1st Cir.2002).

Likely, 642 F.3d at 102. In light of this analysis, the petitioner's claim was necessarily denied because, "[i]f the federal law is not clearly established by the United States Supreme Court, then per force the state court decision cannot be either contrary to or an unreasonable application of clearly established federal law" as required by §2254(d)(1). See id.

Here, the situation is essentially the same as in Likely, and the court is bound to apply controlling precedent. Just as the holding of Crawford did not clearly establish that a chemical analysis certificate accompanied by an affidavit was testimonial, see Likely, 642 F.3d at 102, it also did not clearly establish that spontaneous utterances are testimonial if made outside the contexts of police interrogations or "prior testimony at a preliminary hearing, before a grand jury, or at a former trial." See Crawford, 541 U.S. at 68 & n.10. Indeed, in 2005, when applying Crawford, the First Circuit wrote that "[t]he case law in this nascent field is muddled as to whether excited utterances may or may not be classified as testimonial hearsay." See United States v. Brito, 427 F.3d 53, 60 (1st Cir. 2005). Accordingly, because the issue in

54

this case, whether a spontaneous utterance made to a person other than a law enforcement officer was testimonial hearsay, was "exactly one of those areas of uncertainty" left unresolved by Crawford, "there is no argument left that the state court's decision is contrary to or an unreasonable application of 'clearly established' Supreme Court precedent." Likely, 642 F.3d at 102. Ground Five is, therefore, being denied.[15]

## IV. CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Proceedings, the court must "issue or deny a certificate of appealability [("COA")] when it enters a final order adverse to the applicant." To receive a COA, petitioner must make "a substantial showing of a denial of a constitutional right." See 28 U.S.C. §2253(c)(2). Petitioner must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Miller-El, 537 U.S. at 338 (citing Slack v.

---

[15]Whether the admission of Laura Portal's spontaneous utterance was harmless if done in error is a closer and more complicated question than the Appeals Court's analysis suggests. As noted by the Appeals Court, this statement was cumulative to the extent it only served to prove the victim's routine. See Whitney II, 826 N.E.2d at 227-28. However, Laura Portal's statement to the dispatcher also served as important proof that the victim was, in fact, still alive when petitioner arrived at the Portal home. The prosecution stressed the statement's importance in its closing argument to support the inference that the victim in fact walked out of the home at the time petitioner was purportedly lying in wait to kill him. See SA Ex. 16 at 107-09. The statement was certainly important, and possibly necessary, to proving that petitioner killed the victim rather than merely disposed of a car containing his body.

<u>McDaniel</u>, 529 U.S. 473, 484 (2000)).  "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." <u>Id</u>.

Although the court believes that its decisions are correct, the claims are complex, certain areas of the law are unclear, and the decisions are sufficiently debatable to warrant the issuance of a COA as to all claims.

V.  ORDER

Accordingly, it is hereby ORDERED that:

1.  Petitioner's Petition under 28 U.S.C. §2254 (Docket No. 1) is DENIED.

2.  A COA is GRANTED as to Grounds One, Two, Three, Four, and Five.

<u>    /s/ Mark L. Wolf    </u><br>
UNITED STATES DISTRICT JUDGE